**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

CARL R. GILBERT, II,
and SHARON GILBERT,

       Plaintiffs,

    v.                           Case No.: 3:08-cv-51-RV/MD

HARRY R. MCNESBY, Sheriff
of Escambia County, Florida;
CHARLIE WALKER, Code
Enforcement, Supervisor, Escambia
Board of County Commissioners;
SOTIRIOS THAGOURAS, Code
Enforcement Officer, Escambia Board
of County Commissioners,

       Defendants.

_____/

## ORDER

Now pending are four motions for summary judgment filed by the defendants (docs. 131, 134, 136, 137).

## I.   BACKGROUND

The following facts are either undisputed or, if disputed, resolved in favor of the plaintiffs.

At all times relevant, Harry R. McNesby was the Sheriff of Escambia County; Charlie Walker was a Code Enforcement Supervisor; and Sotirios Thagouras was a Code Enforcement Officer. Code enforcement officers are tasked with enforcing Escambia County ordinances. They generally derive their enforcement authority from the Code Enforcement Office and Board of County Commissioners, not the Sheriff's Office. However, for the time period relevant to this case, the Sheriff's Office issued code enforcement officers "commission cards," which contained the same language that appeared on cards issued to deputy sheriffs. Sheriff McNesby issued commission cards to the defendants Walker and Thagouras. A letter on Sheriff McNesby's letterhead,

which was signed with his approval, indicates that the code enforcement officers were authorized "by the Sheriff to use police powers in a limited capacity." Larry Smith, Chief Deputy with the Sheriff's Office, testified that the commission cards gave the enforcement officers "the same full authority of any deputy." The code enforcement officers were authorized to use "blue lights" to conduct traffic stops of suspected violators. When they made the traffic stops, the officers were required to notify the communication section of the Sheriff's Office so the location of the car, its tag number, and other information could be recorded with the Sheriff's Computer Aided Dispatch (CAD) system. The officers were also "decked out" with badges, handcuffs, pepper spray, radios, and "khaki type SWAT team uniforms." At some point, Sheriff McNesby learned that they were conducting criminal investigations, applying for arrest warrants, and carrying firearms.[1]

Despite the fact that the code enforcement officers had the same general authority as regular deputies, Sheriff McNesby has acknowledged that the Sheriff's Office "did not provide training or supervision to the Escambia County code enforcement officers who had been provided commission cards." He has further acknowledged that the Sheriff's Office "did not develop any policies to govern the actions of the code enforcement officers carrying out their duties and enforcing county ordinances." Rather, Sheriff McNesby relied on Walker to make certain that the code enforcement officers were being supervised and that they "maintained the training required by the Florida Department of Law Enforcement." Walker, in turn, delegated

---

[1] Sheriff McNesby has testified that his agreement with the Board of County Commissioners did not authorize the code enforcement officers to be armed. When he first learned that they were carrying guns, in or about 2002, he told the Escambia County Administrator that the officers could not be armed. He learned a few years later that code enforcement officers were once again carrying firearms, so he once again "advised the Escambia County Administrator that this was not acceptable to me." In or about February 2008, almost two years *after* the events giving rise to this case, Sheriff McNesby decided that code enforcement officers would no longer be commissioned. He revoked their commission cards because, after they were caught carrying firearms for the second time, he realized that "they're not being trained and they're not being supervised and I can't bond them."

partial responsibility for training the code enforcement officers to Jason Comans, a code enforcement and field training officer. According to then-Chief Code Enforcement Officer Susan Nicholas, whose testimony will be discussed in detail *infra*, Comans did not have the necessary education, training, or enough years in law enforcement to serve as an instructor, and much of the training was done "behind closed doors." Furthermore, Comans and certain of the other code enforcement officers (including defendant Thagouras) had been the subject of "many, many complaints" and were causing problems within code enforcement. When Nicholas brought her concerns to Walker, she alleges that he cursed at her and told her to mind her own business.

There were numerous complaints that several code enforcement officers, including Thagouras, were overly aggressive and excessive in carrying out their duties. Nicholas and other people within the department referred to these officers as "the goon squad." Nicholas testified that there were "a lot of problems" with these officers because, among other things, they sought arrest warrants and tried to harass and shut down code violators, rather than engage in the less "drastic" options available to them.[2] These officers were all close and personal friends with Walker, and he allegedly protected them from any discipline. For example, Nicholas completed a nine-month evaluation of Thagouras and noted that he had a problem with "aggressiveness towards people," but Walker did nothing about it. On another occasion she learned that Thagouras had used an alias, lied on his job application, and failed to disclose a prior felony conviction for stealing $11,000 from a former employer, but Walker did not terminate his employment. To the contrary, Walker got "very mad" and "very upset" at

---

[2] At her deposition, Officer Nicholas was asked about the code enforcement officers issuing notices to appear, summonses, and arrest warrants. She testified:

> I almost want to laugh at that. That's the silliest thing I ever heard of, when they have all of these other alternatives. . . . [C]ode enforcement officers are public servants. They're supposed to work with the public, not, you know, close their business down or harass them. . .

Nicholas when she brought it to his attention.[3]

Walker thus knew that there were allegations of Thagouras and some of the other code enforcement officers being overly aggressive. Although the plaintiffs do not appear to claim that Sheriff McNesby had such specific and personal knowledge (nor does it appear that he did, on the record as now developed), Sheriff McNesby conceded during deposition that he had been generally aware of the "problems with Code Enforcement and some of the things that they were doing."

One of the things code enforcement was doing, in or about December 2005, was investigating a possible zoning and permit violation by the plaintiffs Carl and Sharon Gilbert. The plaintiffs, husband and wife, jointly owned a business that hauled construction and demolition debris. Thagouras was called out to investigate, *inter alia*, whether the plaintiffs had the necessary solid waste permit. They did not. Thagouras issued a cease and desist order and notice of violation to the plaintiffs, after which Mr. Gilbert contacted the Escambia County Department of Solid Waste and applied for the necessary permit. Importantly, Mr. Gilbert alleges that Walker personally told him that "once the application is submitted," then he could continue to run his business while the permit was being processed and that he would not be arrested.[4]

After expressly telling the plaintiffs that they could continue to operate and that they would not be arrested, Walker directed Thagouras to prepare a warrant application and submit the warrant to the County Attorney's Office for review. The affidavit that accompanied the warrant application did not mention that Walker had given the plaintiffs

---

[3] It is unclear when Nicholas and Walker learned of Thagouras's conviction. Walker has testified that they knew of the issue before Thagouras was even hired (yet he authorized his hiring anyway); Nicholas seems to believe it was discovered only after-the-fact.

[4] Mr. Gilbert testified at deposition: "Charlie Walker told me that . . . once the application is submitted, that you can operate and none of those people [with pending permit applications are] ever arrested." Elsewhere during his deposition he was twice asked if "Walker told you that you could operate once your application had been submitted," and he said yes.

permission to continue operating their business. Thagouras, along with a deputy sheriff and other code enforcement officers, later arrested Mr. Gilbert in front of his children. While the charges were pending, Thagouras obtained a second arrest warrant alleging the same general facts as the earlier one. Mr. Gilbert was subsequently arrested on this second warrant as well, and he went to trial on both arrest warrants in June 2006. He was acquitted of all charges when the prosecution failed to identify him and adequately demonstrate ownership of the property at issue. In dismissing the charges, the county court judge stated:

> Mr. Gilbert, if that is in fact who you are -- and I don't know who you are yet because the State never identified you -- these charges are being dismissed. But if there are any things that need to be corrected at that property, if that property is in fact yours, I would suggest you have it done *because I think you've got an individual who's very interested in your case, I'll put it that way,* a code enforcement officer in Escambia County.

Nicholas is less circumspect than the emphasized language above. During her deposition, she described Thagouras's "antics" during the Gilbert investigation and opined that Thagouras made a mistake in getting "personally involved" in the case. She said that he was "stalking Mr. Gilbert." When asked to elaborate, Nicholas said that Thagouras would "park and hide to watch Mr. Gilbert," even on his own time. She orally reprimanded him about the Gilbert investigation "many times," but she said that Walker "did not allow" her to issue Thagouras a written reprimand. Nicholas ultimately believes that Walker protected Thagouras and the "goon squad" investigation of the Gilberts because he (Walker) was also personally involved:

> Charlie had a personal vendetta against Mr. Gilbert. I don't know where it came from. Like I said, he was a very vindictive person. Charlie was just as adamant about Mr. Gilbert being, his business being closed, as Thagouras and [Code Officer] Steve Littlejohn were. And the whole bunch of them basically watched him around the clock.[5]

---

[5] Mr. Gilbert testified that after his arrest, and while being transported to the station, the deputy charged with driving him "wanted to know who [he] made mad

Almost immediately after the charges against Mr. Gilbert were dismissed, Walker and Thagouras sought and received a third arrest warrant regarding the same general violations for which he had just been acquitted. Thagouras alleges that the Assistant State Attorney who oversaw the Gilbert prosecution instructed him to obtain the third warrant, a fact that the prosecutor apparently denies.[6] Mr. Gilbert was thereafter arrested a third time at his home in front of his children and neighbors --- by members of the Santa Rosa County Sheriff's Office SWAT team. They handcuffed and put shackles on his feet.[7] Nicholas believes that, in doing so, Walker and Thagouras exceeded their authority: "They can't harass people. They can't go arrest people three times for the same thing." The prosecutor subsequently dismissed the case when it was found that "Defendant was previously adjudicated not guilty of these charges on June 8th, 2006." This action followed.

Invoking jurisdiction pursuant to Title 42, United States Code, Section 1983, the plaintiffs filed a seven-count complaint against the defendants in state court. The first three counts are each labeled a "Civil Rights Claim." Essentially, Mr. Gilbert takes each arrest warrant and makes the same allegations regarding the actions of Thagouras and Walker. In Counts I and II, Thagouras is alleged to have applied for the first two arrest warrants without probable cause. This allegedly caused him to suffer violations of his Fourth, Fifth and Fourteenth Amendment rights. In Count III, he alleges that Thagouras was motivated by malice and evil intent because of the ruling by the county court which exonerated him of all charges, which also violated the Fourth, Fifth and Fourteenth Amendments. In all three counts, it is claimed that Walker and Sheriff McNesby had the responsibility to supervise and train Thagouras and did not do so, and that Sheriff

---

because she's never seen them arrest someone for this."

[6] Although she has no direct and personal knowledge whether the prosecutor told Thagouras to seek the third arrest warrant, Nicholas has testified "I doubt that happened."

[7] The defendants deny that the plaintiff was arrested by the SWAT team and shackled. These disputed facts must be resolved in favor of the plaintiffs.

McNesby did not establish appropriate policies and procedures for code enforcement officers, all of which caused him to suffer violations of his rights under the Fourth, Fifth and Fourteenth Amendments. The complaint also alleges that Walker was personally involved in the actions taken against Mr. Gilbert.

In Counts IV-VI, Mr. Gilbert raises a state law claim of malicious prosecution for each arrest warrant on the grounds that Thagouras submitted an affidavit based upon inaccurate, misleading, and false information in reckless disregard of the truth. In Count VII, Ms. Gilbert advances a state law claim for loss of consortium. Walker and Thagouras are each sued in their individual and official capacities, while Sheriff McNesby is sued only in his official capacity.

The case was later removed to this court on the basis of federal question jurisdiction, after which, upon motion, I dismissed the claims of equal protection under the Fifth and Fourteenth Amendments. The defendants now move for summary judgment on the remaining causes of action, contending that there was probable cause for the three arrests, that there is insufficient evidence to prove the claims, and that they are entitled to qualified and/or statutory immunity. Sheriff McNesby moves separately for summary judgment on the grounds that he was not responsible for training and supervising the code enforcement officers, that he was not personally involved in the Gilbert investigation, and that the investigation was not pursuant to an official custom or policy.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

However, summary judgment is inappropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact will be "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *See id.* On summary judgment, the record evidence and all reasonable inferences drawn therefrom must be viewed in a light most favorable to the non-moving party. *National Fire Ins. Co. of Hartford v. Fortune Const. Co.*, 320 F.3d 1260, 1267 (11th Cir. 2003).

## III. DISCUSSION

Upon careful review of the pleadings and all other pertinent materials on file, and viewing the facts in the light most favorable to the plaintiffs, I find that there are multiple genuine disputed issues of material fact precluding summary judgment on the grounds raised by the defendants. To point to just two of several examples, Sheriff McNesby contends that because he did not "employ" the code enforcement officers, but rather they fell under the Code Enforcement Office and Board of County Commissioners, then the Sheriff's Office cannot be responsible. However, as indicated above, Sheriff McNesby issued "commission cards" and deputized the defendants. They were authorized to use "police powers in a limited capacity" and had "the same full authority of any deputy." On this record, I cannot hold as a matter of law that the Sheriff's Office had no responsibility to train and supervise these deputized officers or develop appropriate policies. Furthermore, dating all the way back to 2002 and continuing through 2008, Sheriff McNesby knew of the "problems with Code Enforcement and some of the things that they were doing," although the full extent of that knowledge is unclear. *See, e.g., Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir. 1990) (supervisory liability under section 1983 can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation"). That Sheriff McNesby believed he bore at least some responsibility for the

code enforcement officers is shown by the fact that he revoked their commission cards when he realized (after they twice got caught carrying firearms, and after the events giving rise to this case) that "they're not being trained and they're not being supervised and I can't bond them."

Walker and Thagouras argue, *inter alia*, that there was sufficient probable cause to arrest Mr. Gilbert because the warrant applications were reviewed and approved by the County Attorney's Office. The defendants thus contend that "[n]o § 1983 liability can arise for Escambia County where the actions of its decision makers, even final decision makers, are subject to meaningful administrative review." However, the plaintiffs correctly point out that some important and highly relevant information was omitted from the warrant applications that were reviewed. Most notably, the warrant applications omitted the fact (which I must accept as true) that Walker had himself told Mr. Gilbert that he could continue to operate his business, *without fear of being arrested*, while the permit application was pending. The plaintiffs contend, and I agree, that "[n]o reasonable Magistrate would have issued an arrest warrant for an alleged violation that an individual had been given permission to conduct *by the very agency* which was applying for the warrant."[8]

---

[8] The defendants' reliance on my earlier decision in the companion case, *see Mandel v. McNesby, Walker, Thagouras,* 3:08cv49 (RV/MD), is misplaced. In that case, I held that there was probable cause for Mr. Mandel's arrest even though he, too, had been told that he could operate his business while his permit application was pending. Specifically, I noted: "The fact that a county representative told Mr. Mandel that he could operate without a permit while his application was being processed does not establish that he was immune from criminal charges." But, the plaintiffs in *Mandel*, unlike the plaintiffs here, did not allege that the person seeking the arrest warrant and pursuing the criminal charges was the same person who told them that they could operate without a permit. The plaintiffs there merely alleged that another person in another department (Sandra Jennings, the Director of the Escambia County Department of Solid Waste) had told Mr. Mandel that they could operate while their application was being processed. The complaint in *Mandel* thus did not allege that the code enforcement officers knew anything about the earlier assurance when they arrested Mr. Mandel. Without such knowledge, the officers had a reasonable basis and probable cause to believe the violation had occurred. Here, by contrast, viewing the disputed facts in favor of plaintiffs, Walker and Thagouras not only knew that there was no probable cause, but, arguably,

**IV.     CONCLUSION**

As stated above, the defendants' motions for summary judgment (docs. 131, 134, 136, 137) are DENIED.

DONE and ORDERED this 24th day of August, 2009.

/s/ *Roger Vinson*
ROGER VINSON
Senior United States District Judge

---

they deliberately *induced* Mr. Gilbert to violate the law when Walker told him that he was free to continue operating his business without fear of prosecution.

*Case No.: 3:08-cv-51-RV-EMT*